UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ANNETTE SMITH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Cause No. 1:21-CV-253-HAB |
| CASILO CONSULTING, INC. DBA VECTOR SERVICES, | ) ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

Plaintiff was sexually harassed at her workplace and then fired after she reported the harassment. After Defendant failed to appear or defend Plaintiff's claim, Plaintiff obtained an entry of default. Now before the Court are Plaintiff's Memorandum and Supplemental Memorandum in Support of Default Judgment and Damages (ECF No. 19, 21).

**I.     Factual and Procedural Background**

Because an entry of default has been entered, the Court accepts Plaintiff's well-pleaded facts as true. Plaintiff, an African American woman, was employed by Defendant as a traffic control employee. She directed traffic at work sites in Fort Wayne, Indiana. Plaintiff performed this duty well and met Defendant's legitimate performance expectations.

In July 2020, Plaintiff was sitting in a work truck with a male co-worker when the co-worker offered to show Plaintiff a picture of his dog. Plaintiff agreed but instead of a picture of a dog the co-worker showed her a picture of his penis.[1] Plaintiff was offended and upset by the photo and told her co-worker as much.

---

[1] The version of this event in the Complaint is different from the version in Plaintiff's affidavit submitted in support of default judgment. Plaintiff now asserts that the co-worker did show her a picture of his dog. After showing the dog picture, the co-worker then offered to show her a picture of his broken legs. When Plaintiff agreed to see the leg

Sometime later, Plaintiff reported the incident to her union representative who, in turn, reported the incident to Defendant. The co-worker was not disciplined; instead, he was told not to do it again. The co-worker later harassed Plaintiff while she was working on a jobsite, but the extent and nature of that harassment is not disclosed in the complaint.[2] Less than one month after the report, Plaintiff received a phone call telling her that she was being terminated.

Plaintiff filed a two-count complaint alleging sexual harassment and retaliation in July 2021. Defendant never appeared or defended. Plaintiff sought an entry of default in January 2021, and the clerk's entry of default was entered the next day. Plaintiff then moved for default judgment. A hearing was held in May 2022, at which time Plaintiff was directed to submit evidence of her damages and attorney fees. Plaintiff's memoranda contain her damage evidence.

## II.   Legal Discussion

"The basic effect of an entry of default . . . is that '[u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true.'" *VLM Food Trading Intern., Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (citations omitted). Default judgment, however, is not automatic. Plaintiffs seeking default judgment must show that they are entitled to judgment as a matter of law. *Cass Cnty. Music Co. v. Muedini*, 55 F.3d 263, 265 (7th Cir. 1995).

"Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). "'Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct

---

picture, she was presented with an x-ray of the co-worker's legs and "an extremely noticeable and clear picture of his naked penis exposed between his legs." (ECF No. 19-1 at 2).

[2] As disclosed in Plaintiff's affidavit, the "harassment" was the co-worker honking a truck horn as Plaintiff's passed by. (ECF No. 19-1 at 3).

an inquiry in order to ascertain the amount of damages with reasonable certainty.'" *Id*. (quoting *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).

**A.**     *Liability*

A plaintiff claiming a hostile work environment based on sexual harassment must establish these elements: (1) she was subject to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability. *Benders v. Bellows and Bellows*, 515 F.3d 757, 768 (7th Cir. 2008). The Court finds the third element lacking.

For an employer's conduct to be considered actionable sexual harassment, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory." *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999). In making this determination, the effect of the perpetrator's conduct on the plaintiff's work environment is assessed both objectively and subjectively. *Hostetler v. Quality Dining, Inc*., 218 F.3d 798, 806–07 (7th Cir. 2000).

Plaintiff experienced a single instance of sexual harassment, not enough to qualify as pervasive. *Morales v. GEO Grp., Inc.*, 824 F. Supp. 2d 836, 851 (S.D. Ind. 2010) ("[G]iven that this was one event in a nine-month period, [the conduct] is not one that could be characterized as pervasive.'"). The single instance of conduct could be seen as severe, *see Baskerville v. Culligan*

3

*Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (placing "pornographic pictures"[3] in the same category as "sexual assaults"), but it is rare that one act of harassment will create a hostile work environment. *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006). The Court has no doubt that Plaintiff's experience was unpleasant, but, by itself, it did not create a hostile work environment. *See Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1274 n.4 (7th Cir. 1991) (identifying a Ku Klux Klan's cross burning as the kind of single instance that would support a Title VII claim).

Nor is there any evidence that the photo unreasonably interfered with Plaintiff's work performance. The only facts related to Plaintiff's work performance in the complaint are that she "performed her duties well and met Defendant's legitimate performance expectations." (ECF No. 1 at 2). The lack of any effect on Plaintiff's work performance supports the conclusion that her complaint fails to establish actionable sexual harassment.

That said, Plaintiff has stated a claim for retaliation. To establish retaliation under Title VII, Plaintiff must prove she: (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Miller v. Polaris Lab., LLC*, 797 F.3d 486, 492 (7th Cir. 2015). Plaintiff has alleged that she engaged in protected activity (reporting the harassment), that she suffered an adverse employment action (termination), and that the termination was caused by the protected activity (ECF No. 1 at 4). Plaintiff has established Defendant's liability for retaliation under Title VII.

---

[3] How much the picture shown to Plaintiff was "pornographic" is less than clear. Plaintiff's affidavit makes the picture sound less like a classic "dick pic" and more like a radiographic outline of a man's scrotum. Neither is appropriate in a workplace setting, but the former strikes the Court as much more severe than the latter.

4

**B.     *Damages***

Once there has been a finding of employment discrimination, there is a presumption that the employee is entitled to an award of back pay. *See E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817–18 (7th Cir. 1990). The claimant must establish the amount of damages, but she is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Gurnee Inn*, 914 F.2d at 817–18; *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847–48 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (same). "Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044; accord *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) (holding that it is "[n]ot until the plaintiff establishes what she contends are her damages [that] the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant").

For the back pay calculation, Plaintiff has provided the following evidence. She states that she made $23.39 per hour and worked fifty hours per week on average. Plaintiff also earned forty-five cents per hour "in an annuity" and $144.00 per month towards her pension. That works out to $935.60 in regular wages per week, $350.90 in overtime wages, and $22.50 in annuity payments.

Plaintiff asks that she be awarded these amounts for one hundred weeks—the time from her termination to the time of her damages request—but the Court sees the duration differently. Plaintiff states in her affidavit that her job with Defendant was a "two-year project." (ECF No. 19-1 at 4). She began the project on May 11, 2020, (*id.* at 1), so the job would have concluded in May 2022. Plaintiff also testifies that her termination was effective at the end of July 2020. The number

5

of weeks between August 1, 2020, and May 11, 2022, is ninety-two. The Court will use that number for calculation purposes.[4] *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998) (ending front pay award at date the plaintiff would have lost her job because of a merger). Plaintiff's gross back pay, then, is $86,075.20 in regular wages, $32,282.80 in overtime wages, and $2,070.00 in annuity payments. Adding twenty-one months of pension payments—the number of months from Plaintiff's termination to the anticipated end of the project—gives another $3,024.00. In total, Plaintiff's gross back pay is $123,452.00.

The Court says gross back pay because Title VII plaintiffs have a duty to mitigate their damages. *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989). Plaintiff did so, earning $22,620.00 from other employment and $11,250.00 in unemployment benefits. This leaves a net back pay award of $89,582.00.

Plaintiff also requests prejudgment interest, to which she is presumptively entitled. *Hutchison*, 42 F.3d at 1046. The Court must use the prime rate when assessing prejudgment interest. *Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1011 (N.D. Ill. 2016). The prime rate for most of the relevant period was 3.25%.[5] Compounded monthly, *Ryl-Kuchar v. Care Ctr., Inc.*, 564 F. Supp. 2d 817, 829 (N.D. Ill. 2008), Plaintiff is entitled to $5,229.52 in prejudgment interest. Added to the net back pay, Plaintiff's total recovery is $94,711.52.

Plaintiff also requests compensatory damages under 42 U.S.C. § 1981a(b)(3). These damages include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id*. The amount of

---

[4] Plaintiff states in a supplemental affidavit that she "would have received an extra $1/hr [sic] in pay" beginning in April 2021. (ECF No. 21-1 at 2). Plaintiff does not explain the basis for this anticipated raise. Was it contractual? Based on some performance metric? Contingent on remaining funds? Because the Court has no information on this anticipated raise, it will not include the raise in the back pay award. *Doll v. Brown*, 75 F.3d 1200 (7th Cir. 1996) (discussing the application of the "lost-chance" theory to employment discrimination cases).
[5] https://www.jpmorganchase.com/about/our-business/historical-prime-rate

compensatory damages available depends on how many people Defendant employs. *Id*. Citing LinkedIn, Plaintiff states that Defendant has between 50 and 201 employees. (ECF No. 21 at 3). That's not all that helpful, as that range spans two different statutory caps. 42 U.S.C. § 1981a(b)(3)(A) and (B). Other websites put the number of employees as high as 82[6] and as low as 17[7]. It is difficult for the Court to determine, then, whether Defendant is subject to the $50,000 cap in subsection (A) or the $100,000 cap in subsection (B).

A discussion of the cap is ultimately irrelevant, though. The Court does not find that the conduct here falls within the category of cases that call for a cap award. Plaintiff does testify that she suffered mentally from the episode and does provide the Court with documentation showing mental health treatment after her termination. (ECF Nos. 21-2, 21-3). But the Court notes that the doctors do not relate the treatment to the conduct, and Plaintiff does little more than draw a temporal connection. (ECF Nos. 19-1 at 4, 21-1 at 2). In any event, considering the record before it, the Court finds that an award of $25,000.00 is appropriate for Plaintiff's emotional pain and suffering and mental anguish. This is the amount the Court would have set no matter the statutory cap.

Finally, Plaintiff requests an award of attorney fees. In Title VII actions, the prevailing party may recover reasonable attorneys' fees under 42 U.S.C. § 2000e–5(k). To determine a reasonable fee, the district court uses the lodestar method, multiplying the "number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar approach forms the "centerpiece" of attorneys' fee determinations, and it applies even when the attorney represents the prevailing party under a contingent fee agreement. *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989). There is a strong

---

[6] https://www.zoominfo.com/c/vector-services/443817958
[7] https://rocketreach.co/vector-services-profile_b42aae1efe02337f

presumption that the lodestar calculation yields a reasonable attorneys' fee award. *Eddleman v. Switchcraft, Inc.*, 927 F.2d 316, 318 (7th Cir. 1991).

Unfortunately, Plaintiff has not provided the necessary information to formulate an attorney fee award. Plaintiff's counsel has submitted an attorney fee affidavit, but it references only her contingent fee percentage. (ECF No. 19-2). The contingent fee agreement may govern the contractual relationship between Plaintiff and her counsel, but it does not set the amount of an attorney fee award. If Plaintiff seeks attorney fees, she must provide the Court with the number of hours expended on this case and a reasonable hourly rate for Title VII cases in this area.

### III. Conclusion

For these reasons, Plaintiff's Motion for Default Judgment is GRANTED. Plaintiff is awarded back pay in the amount of $89,582.00, prejudgment interest in the amount of $5,229.52, and compensatory damages of $25,000.00. The Clerk of the Court is ORDERED to enter judgment in favor of Plaintiff accordingly. Per Fed. R. Civ. P. 54(d)(2)(B)(i), Plaintiff is ORDERED to supplement her request for attorney fees with competent evidence within fourteen days of the entry of judgment.

SO ORDERED on September 29, 2022.

> s/ Holly A. Brady
> JUDGE HOLLY A. BRADY
> UNITED STATES DISTRICT COURT